IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Case No. 3:13-CR-350-K |
| | § | |
| SANDY JENKINS | § | |

FACTUAL RESUME

Sandy Jenkins, Brett Stalcup (the defendant's attorney), and the United States of America agree that the following is true, correct, and can be used to support Jenkins's pleas of guilty to Counts One, Eleven, and Twenty-One of the Superseding Indictment:

ELEMENTS OF THE OFFENSES

To prove the offense alleged in Count One of the Superseding Indictment, charging a violation of 18 U.S.C. § 1341, that is, Mail Fraud, the government must prove each of the following elements beyond a reasonable doubt:

*First.*   That the defendant knowingly devised or intended to devise a scheme to defraud;

*Second.*   That the scheme to defraud employed false material representations;

*Third.*   That the defendant mailed something or caused something to be sent through the United States Postal Service for the purpose of executing such scheme or attempting so to do; and

*Fourth.*   That the defendant acted with a specific intent to defraud.

To prove the offense alleged in Count Eleven of the Superseding Indictment, charging a violation of 18 U.S.C. § 1956(h) [18 U.S.C. § 1957], that is, Conspiracy to Commit Money Laundering, the government must prove each of the following elements

beyond a reasonable doubt:

> *First.*   That the defendant and at least one other person (that is, codefendant Kay Jenkins) made an agreement to commit the crime of engaging in monetary transactions with property derived from specified unlawful activity; and

> *Second.*   That the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose.

To prove the offense alleged in Count Twenty-One of the Superseding Indictment, charging a violation of 18 U.S.C. § 1014, that is, False Statement to a Financial Institution, the government must prove each of the following elements beyond a reasonable doubt:

> *First.*   That the defendant made a false statement to Bank of America;

> *Second.*   That the defendant knew the statement was false when the defendant made it;

> *Third.*   That the defendant did so for the purpose of influencing a lending action of the institution, that is, to secure a mortgage loan to purchase 35 Cibola Circle, Santa Fe, New Mexico; and

> *Fourth.*   That Bank of America was federally insured.

## STIPULTED FACTS

Starting at least as early as December 2004, and continuing until his termination on or about June 21, 2013, Sandy Jenkins engaged in a massive scheme and artifice to defraud his former employer, The Collin Street Bakery ("Bakery"), in order to financially benefit he and his wife, codefendant Kay Jenkins. During that time, Sandy Jenkins embezzled over $16 million from the Bakery and then he and Kay Jenkins used that money to bank-roll a lavish lifestyle that included a vacation home in Santa Fe, New

Mexico (purchased for approximately $658,000); hundreds of watches and pieces of jewelry worth millions of dollars; numerous luxury automobiles; and over two hundred trips on a private jet.  While this scheme was ongoing, both Sandy Jenkins and Kay Jenkins were well aware that he made approximately $50,000 per year at the Bakery, as reflected on their joint tax returns, and Kay Jenkins did not work outside the home.  After Sandy Jenkins was terminated, once the Bakery discovered the embezzlement, Sandy Jenkins and Kay Jenkins immediately left Corsicana with a significant number of watches and other pieces of jewelry that, several weeks later, were found in and around Lady Bird Lake in Austin, Texas.

The Collin Street Bakery ("Bakery") is a family-owned-and-operated business with headquarters located in Corsicana, Navarro County, Texas, in the Northern District of Texas.  The Bakery was established in 1896 and has several retail locations in Texas, including Corsicana, Lindale, Greenville, and Waco, and is best known for its mail-order fruitcake business.  Defendant Sandy Jenkins was the corporate controller for the Bakery from approximately February 1998 to on or about June 21, 2013, the day he was terminated.  Based on his position at the Bakery, Sandy Jenkins occupied a position of trust that provided him with substantial discretion over the checks written on the Bakery's accounts and management and control over the accounting system used to track the Bakery's finances.

Beginning in at least January 2005 and continuing until on or about June 21, 2013, Sandy Jenkins, in his capacity as corporate controller for the Bakery, devised and executed a scheme to defraud the Bakery by embezzling funds for his own self-

enrichment and caused the use of the United States Postal Service in furtherance of the scheme.  In his role as corporate controller, Jenkins had access to, control over, responsibility for, and trust with the Bakery's accounts payable.  On at least 888 occasions between 2005 and June 21, 2013, Jenkins prepared and printed checks on the Bakery's bank account at Community National Bank & Trust with the electronic signature of the Bakery's president.  Each check was made payable to one of Jenkins's personal creditors.  Jenkins prepared and printed checks on the Bakery's bank account with the electronic signature of the Bakery's president.  From the Bakery in Corsicana, Texas, Jenkins mailed the checks, using the Bakery's resources, to his personal creditors using the United States Postal Service for the benefit of Sandy Jenkins and his wife, Kay Jenkins.

Jenkins further admits that he took steps to disguise the embezzlement scheme through manipulation of the records in the Bakery's computerized accounting system.  To that end, Jenkins kept track of the check number and amount to his personal creditor so that he could create a duplicate entry in the Bakery's computerized accounting system—payable to a legitimate Bakery creditor in the same amount on the same day, with the only difference being the supposed "legitimate" check would have a check number that was one more than the check to Jenkins's personal creditor.  Jenkins then made a materially false entry in the Bakery's computerized accounting system purporting to show that the check to his personal creditor had been "voided."  Because it was marked "voided," it only appeared in a report of all voided checks.  The supposed "legitimate" check, however, appeared in the Bakery's books and records, constituting a materially

false entry in the books and records disguising Jenkins's embezzlement of funds.

As further effort to disguise the embezzlement, Jenkins admits that when he wrote fraudulent checks from the Bakery, he wrote checks in amounts that were equal to or less than the previous year's expenditures for the corresponding vendor in the corresponding month so there was no apparent variation in the budget.

Sandy Jenkins admits that between 2005 and 2013, he caused approximately 888 fraudulent checks to be written on the Bakery's account and mailed to his personal creditors, resulting in losses to the Bakery of approximately $16,649,786.91.

On or about January 13, 2011, as one example of the execution of the aforesaid scheme and artifice to defraud, Sandy Jenkins, within the Northern District of Texas, for the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud, and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, knowingly caused to be delivered by the United States Postal Service and private interstate carriers, according to the directions thereon, an envelope containing a check, made payable to Bank of America in the amount of $20,000.00, one of Jenkins's personal creditors, which he mailed from the Bakery to Bank of America, in violation of 18 U.S.C. § 1341.

Sandy Jenkins further admits that prior to the check-writing embezzlement scheme described above, he improperly took money from the Bakery's petty-cash fund on a regular basis. Between 2004 and 2013, Sandy Jenkins admits that he stole at least $114,342.04 from petty cash at the Bakery.

Jenkins further admits that as he was embezzling over $16 million from the

Bakery, he and his wife, codefendant Kay Jenkins, used the money to fund an incredibly lavish and opulent lifestyle. Beginning at least as early as December 2004, and continuing thereafter until at least August 2013, in the Dallas Division of the Northern District of Texas and elsewhere, the defendant Sandy Jenkins did knowingly and willfully combine, conspire, confederate, and agree with his wife, Kay Jenkins, to commit the offense of engaging in monetary transactions with property derived from specified unlawful activity, in violation of 18 U.S.C. § 1956(h)—that is, Sandy Jenkins and Kay Jenkins knowingly conspired to engage in monetary transactions over $10,000 with property derived from Sandy Jenkins's embezzlement from the Bakery.

Sandy and Kay Jenkins were married in 1971. Starting in or about 1998, Sandy Jenkins began working at the Bakery with an annual salary of approximately $25,000. In or about 2000, Sandy Jenkins was promoted to controller, the position he remained in until his termination in June 2013. At no point during Sandy Jenkins's employment with the Bakery did his annual salary exceed approximately $50,000. Starting in or about 2004, approximately the same time Sandy Jenkins began embezzling money from the Bakery, Kay Jenkins did not work outside the home.

During this time, Sandy and Kay Jenkins maintained bank accounts (checking and/or savings) with at least the following institutions: Bank of America, N.A.; Century Bank, F.S.B.; JP Morgan Chase Bank, N.A.; Prosperity Bank; and Wells Fargo Bank, N.A. Further, Sandy and Kay Jenkins maintained credit card accounts with at least the following institutions: American Express Company; American Express Bank, F.S.B.; American Express Centurion Bank; Bank of America, N.A.; Capital One Bank; Capital

One N.A.; Capital One Financial Corporation; Chase BankCard Services, Inc.; Citibank, N.A.; FIA Card Services, N.A.; First USA Management Services, Inc.; GE Capital Financial, Inc.; MBNA America Bank, N.A. d/b/a MBNA America; The Neiman-Marcus Group, L.L.C., f/k/a The Neiman-Marcus Group, Inc.

As an act in furtherance of the conspiracy, Sandy Jenkins further admits that on or about December 29, 2004, in the Northern District of Texas, he knowingly made a false statement and report for the purpose of influencing the action of Bank of America, N.A., whose deposits were then insured by the Federal Deposit Insurance Corporation, in connection with the application for a mortgage loan to purchase 35 Cibola Circle, Santa Fe, New Mexico 87505, in that, in the joint Uniform Residential Loan Application, Sandy Jenkins and Kay Jenkins listed a total monthly income of $25,000 when, in truth and fact, as they well knew, Sandy Jenkins's and Kay Jenkins's total monthly income was far less than $25,000 per month, in violation of 18 U.S.C. § 1014.

Sandy Jenkins further admits that Kay Jenkins signed the mortgage documents, including the Uniform Residential Loan Application, to purchase the property in Santa Fe at a location in Dallas, Texas.

In furtherance of the conspiracy, Sandy and Kay Jenkins primarily spent the embezzled funds by making charges on an American Express Centurion credit card (i.e., a "black" American Express card which charges a $2,500 per year service fee but has no limit). Both Sandy Jenkins and Kay Jenkins had an American Express Centurion credit card and both Sandy Jenkins and Kay Jenkins made charges on those credit cards that were subsequently paid off with embezzled funds from the Bakery. Between 2005 and

2013, Sandy Jenkins and Kay Jenkins incurred charges totaling approximately $11,120,449.92 with American Express.

Among other things, the charges included approximately $3.3 million in payments for approximately 223 trips on private jets contracted through North Dallas Aviation to various locations, including Santa Fe, New Mexico; Napa, California; and Aspen, Colorado. Sandy Jenkins further admits that on nearly all of the 223 trips on private jets, he traveled with Kay Jenkins. As representative samples of the charges on the credit card to pay for the private-jet travel, Sandy Jenkins and Kay Jenkins engaged in the following monetary transactions:

- On or about May 21, 2009, Sandy Jenkins and Kay Jenkins, aided and abetted by each other, engaged in a monetary transaction—that is, a charge to the American Express credit card—in the amount of $10,845.60 to pay for Kay Jenkins to travel on a private jet from Corsicana, Texas, to Aspen, Colorado.

- On or about July 11, 2011, Sandy Jenkins and Kay Jenkins, aided and abetted by each other, engaged in a monetary transaction—that is, a charge to the American Express credit card—in the amount of $24,051.38 to pay for Sandy Jenkins and Kay Jenkins to travel on a private jet from Corsicana, Texas, to Santa Fe, New Mexico.

- On or about June 28, 2012, Sandy Jenkins and Kay Jenkins, aided and abetted by each other, engaged in a monetary transaction—that is, a charge to the American Express credit card—in the amount of $29,980.68 to pay for Kay Jenkins to travel on a private jet from Corsicana, Texas, to Ashland, Wisconsin.

- On or about September 21, 2012, Sandy Jenkins and Kay Jenkins, aided and abetted by each other, engaged in a monetary transaction—that is, a charge to the American Express credit card—in the amount of $36,664.80 to pay for Sandy Jenkins and Kay Jenkins to travel on a private jet from Corsicana, Texas, to Napa, California.

Sandy Jenkins further admits that he paid for the American Express bill at the end of each

payment period using funds derived from the embezzlement of money from the Bakery.

Sandy and Kay Jenkins also spent the embezzled funds by making charges on other credit cards, including Citibank credit cards and a Neiman Marcus credit card. Between 2005 and 2013, Sandy Jenkins and Kay Jenkins incurred charges totaling approximately $1,941,596.39 on Citibank credit cards and charges totaling approximately $1,196,773.51 on a Neiman Marcus credit card.

Sandy Jenkins further admits that he made cash advances drawn against the credit-card accounts to obtain monies which were deposited into the checking and savings accounts for Sandy Jenkins's and Kay Jenkins's personal use. Sandy Jenkins further admits that he wrote checks directly to vendors to pay for luxury items using monies he embezzled from the Bakery. Sandy Jenkins further admits that he and Kay Jenkins transferred money between accounts in the form of checks written to each other, depositing money obtained through Sandy Jenkins's embezzlement into joint checking and savings accounts. As an example, on or about April 9, 2009, Sandy Jenkins and Kay Jenkins engaged in monetary transactions when Sandy Jenkins wrote a check to Kay Jenkins in the amount of $44,000 with funds derived from Sandy Jenkins's embezzlement from the Bakery, which Kay Jenkins deposited into a joint Bank of America savings account.

Sandy Jenkins further admits that he and Kay Jenkins purchased significant amounts of watches, jewelry, and other precious items from various vendors, including but not limited to deBoulle Diamond & Jewelry (in Dallas, Texas); Eiseman Jewels (in Dallas, Texas); Hotchfield Jeweler (in Aspen, Colorado), Bachendorf's (in Dallas,

Texas), and Neiman Marcus (in Dallas, Texas).  On many occasions, Sandy Jenkins and

Kay Jenkins shopped together at these and other locations in which both men's and

women's jewelry and watches were purchased, often using the American Express

Centurion card, which was later paid off with funds embezzled from the Bakery.  As

particular examples only, Sandy Jenkins admits that the following transactions each

involved money embezzled from the Bakery:

- On or about December 20, 2006, Sandy and Kay Jenkins, aided and abetted by each other, purchased five Rolex watches for $52,765.75 at Eiseman Jewels in Dallas, Texas, the invoice bearing the name Kay Jenkins;

- On or about February 12, 2007, Sandy and Kay Jenkins, aided and abetted by each other, purchased a Ulysse Nardin watch for $22,359.05 from Eiseman Jewels in Dallas, Texas, the invoice bearing the name Kay Jenkins;

- On or about February 15, 2007, Sandy and Kay Jenkins, aided and abetted by each other, purchased a Gents Rolex watch for $19,592.50 from Eiseman Jewels in Dallas, Texas, the invoice bearing the name Kay Jenkins;

- On or about December 24, 2007, Sandy and Kay Jenkins, aided and abetted by each other, purchased a Ladies Rolex watch for $41,000.00 from Eiseman Jewels in Dallas, Texas, the invoice bearing the name Kay Jenkins;

- On or about December 28, 2007, Sandy and Kay Jenkins, aided and abetted by each other, purchased women's ruby and diamond earrings for $95,260.00 from Eiseman Jewels in Dallas, Texas, the invoice bearing the name Kay Jenkins.

Sandy Jenkins further admits that he and Kay Jenkins were invited into private

rooms to view jewelry at deBoulle Diamond and Jewelry, Neiman Marcus, and

Bachendorf's in Dallas, Texas.  Sandy Jenkins further admits that he and Kay Jenkins

kept watches in the air vents at their Corsicana house in addition to keeping a specialty

jewelry safe.

Sandy Jenkins further admits that on or about June 21, 2013, the day he was terminated from the Bakery, he gathered a significant number of watches and other luxury items, such as jewelry, and departed from his house in Corsicana with the items. Kay Jenkins knew that Sandy Jenkins was gathering the jewelry and watches in order to get rid of them. Sandy Jenkins admits that he took the items to Austin, Texas, where he stored them in a safe controlled by his daughter. A few weeks later, at or about the same time the Federal Bureau of Investigation was executing a search warrant at the Jenkins' Corsicana home, Sandy Jenkins retrieved the items from the safe. On or about July 24, 2013, in the morning, Sandy Jenkins took a bag containing the watches and luxury items to Lady Bird Lake (formerly known as Town Lake) in Austin, Texas, a popular hike-and-bike trail near downtown Austin. Sandy Jenkins attempted to dispose of the watches and other luxury items by discarding them in and around Lady Bird Lake. Sandy Jenkins admits that he discussed with Kay Jenkins that he was getting rid of the watches and other luxury items because they were evidence that he stole money from the Bakery.

Although Sandy Jenkins never specifically discussed with Kay Jenkins that he was embezzling funds from the Bakery, Sandy Jenkins admits that he and Kay Jenkins had numerous discussions in which Kay Jenkins was knowledgeable and aware that the money used to fund their lifestyle was not from a legitimate source. At least the following events occurred, which Sandy Jenkins admits shows that Kay Jenkins knew that the money was from an illegitimate source (that is, stolen from the Bakery):

- Sandy Jenkins frequently told Kay Jenkins that the money was from the

Fishers, a married couple who did business with the Bakery. On several occasions, Kay Jenkins asked Sandy Jenkins if they would get into trouble over the "Fisher money." Sandy Jenkins stated that they would not get in trouble over the Fisher money but that they could get into trouble over taxes with the Internal Revenue Service because they were not reporting any of the money as income.

- On certain occasions, Sandy Jenkins told people that his cousin, who was in the mortuary business, had a private jet, which Sandy Jenkins and Kay Jenkins used. Sandy Jenkins admits that he used this excuse over a hundred times in front of Kay Jenkins with others and that Kay Jenkins knew that his cousin did not have a private jet or the financial means to obtain a private jet.

- Kay Jenkins told Sandy Jenkins that people in Corsicana asked about their expensive lifestyle. Kay Jenkins asked Sandy Jenkins what she should say when people asked. Sandy Jenkins told Kay Jenkins to say it was from his "contract work." Sandy Jenkins also told Kay Jenkins to give various explanations, including that the private jet was from Sandy Jenkins's cousin, which Kay Jenkins knew to be false.

- Sandy Jenkins told Kay Jenkins not to bring up the Fishers in front of any other employee of the Bakery. Kay Jenkins further knew that if the money was coming from the Fishers, then the money was essentially a kickback and was not legitimate income.

- Sandy Jenkins and Kay Jenkins had disagreements concerning some of the purchases, including the purchase of a necklace from Eiseman Jewels and the purchase of a Bentley automobile. Kay Jenkins told Sandy Jenkins that the necklace was too flashy and looked too expensive to wear to events in Corsicana, Texas. Kay Jenkins made similar statements regarding the Bentley.

- When Sandy Jenkins and Kay Jenkins purchased a vacation home in Santa Fe, New Mexico, Sandy Jenkins told Kay Jenkins that they would lie about their total monthly salary on the loan application in order to qualify for the loan. Sandy Jenkins further admits that Kay Jenkins knew that they were shopping for a vacation home in Santa Fe that cost over $600,000. Sandy Jenkins further admits that Kay Jenkins knew that they did not have a combined monthly income of $25,000 per month or $300,000 annually. Kay Jenkins signed the loan documents.

- Sandy Jenkins and Kay Jenkins jointly prepared a ledger of jewelry and watches in or about December 2007.  Sandy Jenkins admits that he would instruct Kay Jenkins on how much each item cost and Kay Jenkins recorded the information in the ledger.

- On at least one occasion, Kay Jenkins asked Sandy Jenkins what would happen to their financial situation if he died.  Sandy Jenkins stated that the money would stop if he died.

- Kay Jenkins purchased the same automobile, in the same color, multiple times so that others in Corsicana would not know she had a new car.  On one occasion, Kay Jenkins purchased a two-seater convertible Lexus in "midnight blue" but took it back because it was not "peacock blue."

- Sandy Jenkins and Kay Jenkins purchased a queen-sized mattress that cost more than $10,000 at Hastens in Dallas, Texas.  Sandy Jenkins admits that he and Kay Jenkins discussed the purchase price of the mattress.

**----- NOTHING FURTHER ON THIS PAGE -----**

The above facts are true and correct.


_____        April 25, 2014
J. NICHOLAS BUNCH                       _____
Assistant United States Attorney        Date


_____        Apr 25, 2014
SANDY JENKINS                          _____
Defendant                               Date


_____        Apr 25, 2014
BRETT STALCUP                          _____
Attorney for Defendant                  Date


**Factual Resume – Page 14 of 14**